IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,           )
                                   )
v.                                 )          No. 3:10-CR-109
                                   )
CHARLES LYNN CARPENTER,            )          (PHILLIPS/SHIRLEY)
                                   )
              Defendant.           )

## REPORT AND RECOMMENDATION

This case is before the Court on the Defendant's Motion to Suppress [Doc. 15], filed on September 29, 2010. The motion was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). The Court held an evidentiary hearing on October 27, 2010. Assistant United States Attorney Kelly A. Norris represented the government. Attorney Kim A. Tollison appeared on behalf of the defendant, who was also present. The Court took the evidence, the arguments, and the parties' briefs under advisement on October 28, 2010.

## I. POSITIONS OF THE PARTIES

The Defendant stands indicted [Doc. 1] for the manufacture of methamphetamine on or about July 26, 2010 (Count 1), possession with intent to distribute methamphetamine on or about July 26, 2010 (Count 2), and possession of equipment, chemicals, products and materials which may be used to manufacture methamphetamine on or about July 26, 2010 (Count 3). [Doc. 1]. The Defendant asks [Doc. 15] for the suppression of all evidence seized at the defendant's residence and

outbuilding on or about July 26, 2010. [Doc. 15]. The Defendant argues that the warrantless search of his trailer and his two outbuildings violated the Fourth Amendment. [Docs. 15 and 16]. The Defendant argues that the first search of his trailer and outbuildings was conducted without a search warrant and in the absence of any exigent circumstances that would excuse the warrant requirement. [Doc. 15]. He asserts that the warrantless search of his trailer and outbuildings allowed officers to illegally obtain information and evidence, that later was used to obtain a search warrant. [Doc. 15]. Further, the Defendant asserts that the search warrant contained information from an informant who was not shown to be reliable. [Doc. 16]. Therefore, the Defendant argues that the second search of his trailer and outbuilding on July 27, 2010, should be suppressed because it was conducted pursuant to an invalid search warrant. [Doc. 15].

The Government responds [Doc. 19] that the Defendant's argument fails for two reasons. First, the search warrant affidavit does not contain any illegally obtained information because the protective sweep exception to the warrant requirement justifies the police conduct. [Doc. 19]. Second, the Government maintains that even if some of the information obtained from the warrantless searches is determined to have been illegally obtained, the search warrant is still supported by probable cause without this information included in the search warrant affidavit and, thus, the search warrant was valid. [Doc. 19]. Additionally, the Government contends that the informant's tip was corroborated, lending support to the finding of probable cause. [Doc. 19].

## II. TESTIMONY FROM THE OCTOBER 27, 2010 EVIDENTIARY HEARING

### A. Testimony of Detective Derrick Dalton

Detective Derrick Dalton testified that he was employed by the Grainger County

Sheriff's Office. Detective Dalton stated that he had worked for the Grainger County Sheriff's Office since 2002. Detective Dalton testified that he investigated narcotics crimes, including methamphetamine, marijuana, and cocaine. With regard to his training with methamphetamine, Detective Dalton stated that he attended Clandestine Laboratory School conducted by the Southeast Tennessee Methamphetamine Task Force and Advanced Methamphetamine Investigations through the Tennessee Meth Task Force. Detective Dalton stated that he has trained the general public and other officers about methamphetamine

Detective Derrick Dalton testified that pseudoephedrine is one of the main ingredients used in the manufacture of methamphetamine. Also, anhydrous ammonia, fluid, and different types of chemicals are used depending on the cooker. Detective Dalton testified that he was familiar with the smell associated with the manufacture of methamphetamine, further stating that some people classify it as the smell of starter fluid once it is sprayed out of the can. He also described the smell as being like the smell of ammonia or cat urine. Specifically, Detective Dalton testified that the smell emanates from and during the process of manufacturing the drug, and occurs during the "gassing off" stage.

Detective Dalton testified that he was involved in the investigation and execution of an arrest warrant, and later a search warrant, against the Defendant. He described the events leading up to both. The Jefferson County Police Department, specifically Patrolman Burch, contacted Detective Dalton with information that he had stopped individuals with ten to twelve cans of starter fluid, and these individuals informed him that they were in route to the Defendant's residence for the purpose of manufacturing methamphetamine. Detective Dalton testified that Patrolman Burch further informed him that a female spoke with him and reported that there could possibly be "another

3

person" and a shotgun at the residence and the methamphetamine manufacturing site. The woman identified the "other person" by name, as Timothy Livesay. Detective Dalton testified that the female also reported that there was an electronic notification "dinger" that existed on the Defendant's driveway which alerted him to the entrance of other individuals on the property. [Tr. 11]. Detective Dalton said that he was familiar with Tim Livesay, and knew him to manufacture methamphetamine. Detective Dalton testified that he had also previously dealt with Defendant Carpenter in a 2003 incident involving a methamphetamine lab located on the same property (i.e. 502 Branch Road) at issue in the instant case. Detective Dalton testified that during the 2003 encounter, the Defendant fled the scene, but was apprehended a few days later.

Detective Dalton testified that once he received the above information from Partrolman Burch, he contacted Agent Kitts, gave him a brief synopsis of the events, and asked if he would conduct a "drive-by" of the Defendant's property with him. [Tr. 12]. Detective Dalton testified that the purpose of the drive-by was to determine if there was any indication of the smell of methamphetamine close to the property. Detective Dalton stated that the officers did not go onto the Defendant's property at this point. The Government showed Detective Dalton a picture of the Defendant's property on 502 Branch Road, which was introduced as Exhibit A. The picture was of taken of the Defendant's trailer, from the viewpoint of Branch Road. Detective Dalton stated that he and Agent Kitts did a drive-by pf 502 Branch Road, and when facing the Defendant's residence, could smell methamphetamine from the road.

Detective Dalton testified that after he smelled the methamphetamine, he went directly to the Sheriff's Office in Rutledge, Tennessee to check on active warrant for the Defendant's arrest out of Jefferson County, Tennessee. Jefferson County subsequently faxed active warrants for

the Defendant's arrest to Detective Dalton. At this point, Detective Dalton stated that he contacted other officers working on the night in question, and advised the group of officers to assemble at the Sheriff's Office to debrief them on the situation. Detective Dalton stated that he explained to the group of officers that there were active warrants on the Defendant, and that he had received information that the Defendant was in the process of manufacturing methamphetamine. Detective Dalton also explained to the officers the information received indicated there was a possibility that others were on the Defendant's property, particularly Mr. Livesay, as well as a shotgun near the manufacturing site.

Detective Dalton testified that he also received information that Bean Station police had also received a tip that Mr. Livesay was possibly in the process of manufacturing methamphetamine. When the officers in Bean Station tried to locate Mr. Livesay at his residence, the officers did not find Mr. Livesay on the property or the components necessary for the manufacture of methamphetamine. Detective Dalton stated that the officers did not report that they smelled the manufacture of methamphetamine at Mr. Livesay's residence.

Detective Dalton testified that the officers formulated a plan for the execution of the arrest warrants on the Defendant. Detective Dalton stated that due to the history of the Defendant, the history of the area, and the Defendant's address, the foremost priority was officer safety. Detective Dalton explained where he wanted each officer positioned during the execution of the arrest warrants. The Government showed Detective Dalton a sketch drawn by Agent Kitts of the Defendant's residence, which was introduced as Exhibit B. The sketch depicted the Defendant's home, and where various outbuildings were located in relation to the home. Based on the sketch, Detective Dalton explained that the information he received indicated that the Defendant was

cooking methamphetamine in the wood line to the right of the trailer.

Detective Dalton explained that he instructed three officers, Officers Seals, Kitts, and Sawyer, to position themselves on the right side of the residence. Detective Dalton further explained that Officer Cook and himself were to position themselves at the front door and that Patrolman Banks and Officer Masson were to position themselves to the left side of the front door of the trailer. Detective Dalton also testified that the officers had a plan as to how to position their vehicles once they arrived at the residence. Specifically, Detective Dalton would position his car at an angle illuminating the woods to the right of the residence, and that the officers positioned in that area would need to move out of the way of illumination. The second vehicle was to illuminate the woods to the left of the residence. The third vehicle was to illuminate the front door.

After the officers formulated and understood the plan, Detective Dalton testified that officers left the station for the Defendant's residence at 502 Branch Road in Blaine, Tennessee. Detective Dalton stated that as he pulled up the driveway, he detected the odor of the manufacture of methamphetamine was even stronger than earlier in the evening. Detective Dalton testified that the officers arrived around midnight at the Defendant's residence. Upon arrival, Detective Dalton explained that all the officers assumed their positions and that he knocked on the Defendant's front door to execute the arrest warrants. Detective Dalton testified that no one answered the front door and that within a few seconds, Detective Dalton heard the officers at the right side of the residence yell, "Police! Stop!" [Tr. 21].

At this point, Detective Dalton stated that for several seconds, or minutes, there was no radio contact between himself and the officers to the right side of the trailer. Detective Dalton said that once he stopped knocking on the door, he walked from the front door to the back of the

6

trailer, and did not see anyone. Detective Dalton stated that his attempts to contact the other officers via radio continued to fail, and that he assumed someone had fled from inside the residence and the officers had given chase. Detective Dalton stated that the back door to the residence was open. The Government showed Detective Dalton a picture of the opened back door of the residence, which was admitted as Exhibit D. Detective Dalton testified that the picture depicted the open back door of the Defendant's residence, with what appeared to be a plastic baggie at the bottom of the door. Detective Dalton testified that the picture was taken after the search warrant was obtained, from outside the home on the ground or the first step off the deck, and that nothing was touched at the scene before the picture was taken, therefore, depicting the scene that Detective Dalton observed on the evening in question. The Government showed Detective Dalton a sketch drawn by Agent Kitts depicting the floor plan or layout of inside of the Defendant's trailer, which sketch was marked as Exhibit C. Detective Dalton testified that the sketch indicated the location of the bedrooms in the trailer.

Detective Dalton testified that the Defendant had fled the residence, but was eventually apprehended by officers. Detective Dalton testified that the wood line at the back of the residence was at a downward angle and that once the Defendant was apprehended, he was brought up the hill to the front porch of the residence. Detective Dalton testified that he never entered the Defendant's trailer or any outbuildings at this time, or before the search warrant was issued. After the Defendant was apprehended, Detective Dalton explained that he conferred with the other officers about what they observed. Detective Dalton stated that Deputy Seals had entered the trailer, and that Deputy Seals was the only officer who entered the trailer. Detective Dalton stated that Patrolman Banks had entered the outbuildings surrounding the residence. Detective Dalton testified that the

Defendant dropped a few items that were located toward the back of the house. Detective Dalton testified that he also obtained knowledge of the evidence used as the basis for the search warrant from Agent Kitts, and his notes this conversation became the basis for the affidavit for the search warrant.

Detective Dalton testified that he prepared an affidavit and applied for a search and presented the same to Judge O. Dwayne Sloan. The Defendant identified the search warrant that he applied for as the affiant, which was introduced as Exhibit H. Detective Dalton testified that the first page of the affidavit explained who Detective Dalton was, his experience, and some of the facts surrounding the case. Detective Dalton testified that page four described that the property the warrant was to be served upon and the scope of the search. Detective Dalton explained that page five was the return of the items seized.

Detective Dalton testified that he did not personally observe everything in the affidavit. First, paragraph 2a of the affidavit discusses a phone call, which Detective Dalton explained was related to him by Patrolman Burch with the Jefferson City Police. In paragraph 2b, Detective Dalton testified that he personally discovered that arrest warrants were active against the Defendant. Detective Dalton testified that paragraph 2c describes the Defendant fleeing out the backdoor with items in his arms, and the smell of methamphetamine emanating from around the residence. Detective Dalton testified that he personally smelled the methamphetamine, but that he did not personally see the Defendant running out of the house with items in his arms, but that information came from other officers. Detective Dalton testified that paragraph 2d stated that other officers searched a garage through an open door and observed some generators, white slug material, and rubber tubing, but that Detective Dalton did not personally observe those items. Detective Dalton

testified that paragraph 2e noted the dwelling was searched for other subjects; that Agent Kitts saw in plain view from the porch the bag of dry ice. Detective Dalton testified that he thought he also the dry ice from the back porch. The bag of dry ice is seen in Exhibit D underneath the back door. Detective Dalton testified that he did not personally see the cooking stove or the burning flashlight next to coffee filters and glass containers, but this evidence was observed by Agent Kitts without going in the residence. Detective Dalton testified that Agent Kitts did not enter the residence to his knowledge. Detective Dalton testified that he observed the five cans of starter fluid on the groung in the opened building behind the residence.

Detective Dalton reiterated that Agent Kitts informed him of the empty dry ice bags, aluminum foil, drain cleaner, and Lithium strips found in vehicles at the residence. Detective Dalton testified that the above listed items were typically used in the manufacture of methamphetamine. Detective Dalton testified that the search warrant was executed and completed when it was daylight outside. Detective Dalton testified that additional evidence of manufacturing methamphetamine was discovered upon a search of the Defendant's trailer and outbuildings.

On cross-examination, Detective Dalton testified that the call from Officer Burch came in around 10 p.m., indicating that officers had come into contact with a person in a vehicle containing starter fluid. Officer Burch informed Detective Dalton that he spoke with a woman in the vehicle and gave Detective Dalton the name of the woman. Detective Dalton testified that he was familiar with the woman's name, but had not dealt with her personally. Detective Dalton testified that he three to four conversations with Officer Burch on the night in question. Detective Dalton testified that he was unsure of the details regarding the contact with the woman by Officer Burch or if another officer but thought it was at a Wal-Mart, but did not think she was arrested. Detective

Dalton testified that Officer Burch informed him that the starter fluid was found in the rear of the vehicle, and that the woman said they were taking the starter fluid to Mr. Carpenter for his manufacturing of methamphetamine. She also told Officer Burch that Mr. Livesay mightht be there and possibly a shotgun. She described the location of the methamphetamine lab as being in the wood line to the right of the trailer.

Detective Dalton conceded that a methamphetamine lab was not found in the area nor was a shotgun nor was Mr. Livesay.

Detective Dalton re-confirmed that he smelled methamphetamine from Branch Road, when he conducted a drive-by of the Defendant's residence. He estimated this was approximately 1000 feet away but conceded he could not ascertain the actual origin of the smell or whether it was coming from the trailer. Detective Dalton stated that he conducted this drive-by after the first conversation with Officer Burch.

Detective Dalton testified that the officers went to the Defendant's residence that night in order to serve execute the arrest warrants on the Defendant, but would likely look around and deal with the possibility that the Defendant was manufacturing methamphetamine accordingly. Detective Dalton affirmed that he did not enter the residence or outbuildings before obtaining the search warrant but others did. Detective Dalton testified that once the Defendant was apprehended, he requested that ambulance personnel check the Defendant because he was bleeding from the mouth, and one of the officers administered a Taser. After the Defendant was checked by ambulance personnel, Detective Dalton stated that he was Mirandized and taken to jail. Detective Dalton stated that Deputy Cook stayed at the trailer while he obtained the search warrant. Detective Dalton stated that he signed the search warrant affidavit.

Detective Dalton testified on redirect that officers believed that Mr. Livesay was not found at the Defendant's property because he was at Wal-Mart picking up additional materials/equipment to manufacture methamphetamine. Detective Dalton testified that from his position on Branch Road, the odor of the manufacture of methamphetamine was coming from the Defendant's residence and not from behind his position on Branch Road. The Defendant further testified that officers found an electronic notification "dinger" (as described by the woman to Officer Burch) at the bottom of the Defendant's driveway, which would alert people inside the Defendant's residence that someone was driving onto the property.

### B. Testimony of Patrolman Darrick Banks

Patrolman Darrick Banks testified that he worked for the Rutledge Police Department and held the position of patrolman for the last two years. Patrolman Banks testified that he has previously investigated methamphetamine labs and is able to recognize the odor that comes along with the manufacturing process. Patrolman Banks testified that the odor is an "ammonia-like" smell, and that it is very distinct.

Patrolman Banks testified that he was involved in investigating the incident at the Defendant's residence on July 27, 2010. Patrolman Banks stated that he was contacted by Detective Dalton and was advised of the arrest warrants for Defendant Carpenter and also briefed on the situation including information regarding the Defendant making methamphetamine, and the possible presence of "another gentleman" and a shotgun on the Defendant's property. Patrolman Banks testified that the officers arrived at the Defendant's residence around midnight to execute the arrest warrants, and that he was instructed to position himself at the left side of the trailer. Patrolman

11

Banks testified that once the Defendant fled the trailer, he cleared the first building on the left side of the property in order to ensure that no one was in the building. Patrolman Banks testified that he did not chase the Defendant. Patrolman Banks was shown Exhibit B, and testified that he entered two buildings off to the side of the trailer. Patrolman Banks testified that the door was closed to the first outbuilding he entered, but the door to the second outbuilding was open.

Patrolman Banks testified that once the Defendant fled the trailer, he cleared the first building on the left side of the property in order to ensure that no one was in the building. Patrolman Banks was shown a picture which he stated depicted the open door to the second outbuilding he entered. This picture was entered as Exhibit G. Patrolman Banks testified that the photograph was taken in the daylight, but was a fair and accurate depiction of what he encountered on the night in question. Patrolman Banks stated that he entered both buildings based on the information that more than one person was on the property. Patrolman Banks testified that in the second building he entered, he noticed jugs with a hose running out of them. Patrolman Banks testified that he was able to see the jugs in the second building by just taking one step inside building.

Patrolman Banks testified that he remained in the second building for one second in order to make sure no one was in the building. Patrolman Banks stated that he informed Agent Kitts of what he saw in the second building. After he reported to Agent Kitts, Patrolman Banks testified that he watched the backdoor, because once the two buildings were cleared, he wanted to ensure more people did not come out of the open backdoor. Patrolman Banks stated that he could not see well inside the trailer, but noticed something "lit inside," but "couldn't tell what it was or anything." Patrolman Banks did not see the color of the light. At his position, Patrolman Banks testified that he smelled the odor of methamphetamine. Patrolman Banks testified that he did not enter the

outbuildings again, and never entered the trailer.

On cross-examination, Patrolman Banks testified that he became involved in the police investigation of the Defendant around 11 p.m. Patrolman Banks stated that he knew the Defendant from the jail. Patrolman Banks stated that Detective Dalton informed the group of assembled officers that they were executing arrest warrants on the Defendant and that there was a possibility that he was making methamphetamine. Patrolman Banks stated that he was not informed by Detective Dalton to look for the presence of methamphetamine.

Patrolman Banks testified that he entered the outbuildings while the Defendant was being chased down the hill by other officers. Patrolman Banks stated that while he watched the backdoor of the trailer, he saw no one else leave the trailer.

On re-direct, Patrolman Banks testified that he was not directed to go through the two outbuildings. Patrolman Banks stated that he entered the buildings to protect the safety of the other officers there and himself. Patrolman Banks testified that at the time he entered the buildings he was unaware of the identity of the person being chased and arrested.

### C. Testimony of Detective Jeff Seals

Detective Jeff Seals testified that he had been employed by the Grainger County Sheriff's Department since May 2009. Prior to 2009, Detective Seals explained that he started his career in Hawkins County in 1987, then moved to Hamblen County in 1998, and had been involved in the investigation of narcotics for eighteen of those years. Detective Seals stated that he was currently assigned to the General Detective Division where his duties include the investigation of narcotics crimes. Detective Seals explained that the majority of narcotics crimes in Grainger County involved

13

prescription pills and methamphetamine.

Detective Seals testified that while he was not methamphetamine certified by the State of Tennessee, he was familiar the drug and its distinct odor. Detective Seals stated that he was familiar with the precursors that go along with methamphetamine labs, such as: coffee filters, gas jugs, ether, anhydrous ammonia.

Detective Seals testified that he was debriefed at the Grainger County Sheriff's Office by Detective Dalton regarding the arrest warrants for the Defendants. Detective Seals stated that the officers were debriefed on the possibility of another suspect on the Defendant's property, and discussed officer safety in conducting such an operation. Detective Seals asserted that the officers were also debriefed about the possibility of the Defendant running a methamphetamine lab right outside the residence.

Upon arrival at the Defendant's property, Detective Seals stated that he was stationed along the right side of the property with Agent Kitts and Officer Sawyer. Detective Seals testified that there was a "strong foul odor" at the residence, which he associated with manufacturing methamphetamine. Shortly after assuming his position, Detective Seals stated that the back door opened and the Defendant ran off the back porch. Detective Seals asserted that himself, Officer Sawyer, and Agent Kitts chased the Defendant. Detective Seals testified that he saw the Defendant throw something on the ground as he ran. Detective Seals stated that the Officers chased the Defendant down to the woods, however, he did not continue pursuing the Defendant because he did not have a flashlight. Detective Seals stated that Officer Kits and Officer Sawyer continued chasing the Defendant down the mountain, which was approximately a 45 degree angle down the mountain. Detective Seals testified that he stopped chasing the Defendant approximately 50 yards from where

he was taken into custody.

Once Officer Sawyer and Agent Kitts had the Defendant in custody, Detective Seals testified that he went down to where the other officers had the Defendant in custody. Detective Seals testified that he attempted to contact Detective Dalton, but was unable to reach him by portable radio. Detective Seals testified that he came up the hill to locate Detective Dalton and inform him that the Defendant was in custody. Once he arrived at the front of the house, Detective Seals stated that he could not find Deputy Cook and Detective Dalton. Detective Seals stated that he walked back "around the other way," and again did not see the officers. Detective Seals testified that based on the information that someone else had a shotgun, he feared that something had happened to the officers.

At this point, Detective Seals stated that he walked onto the back porch, looked in the open door, and announced himself. Detective Seals testified that he was unsure if someone else had given Detective Dalton access to the residence, so he walked into the residence. Detective Seals testified that it was "pretty dark in there," and in a "defensive sweep" with his weapon, he failed to see anyone. He stated that he went straight out the front door. Detective Seals testified that he did not see any incriminating evidence in the trailer, but noticed a small light coming from the kitchen area of the trailer. Detective Seals stated that he did not seize any evidence upon entering the trailer, and that he did not enter the trailer again without a search warrant. After exiting the trailer through the front door, Detective Seals saw Detective Dalton and Officer Cook coming up the steps.

After finding Detective Dalton and Officer Cook, Detective Seals stated that they went around to the side of the trailer where some vehicles were parked. Detective Seals stated that the officers observed a white female asleep in one of the cars. Detective Seals stated that he did not

observe the lithium and methamphetamine, the items found in vehicle.

On cross-examination, Detective Seals testified that he did not have a flashlight when he entered the trailer, and thought the light he saw may have been a candle. Detective Seals testified that he did not make the statement found in Detective Dalton's affidavit that "[o]nce inside the dwelling on the cooking stove was a burning flashlight next to coffee filters and glass container." Detective Seals testified that he did not see an of the items listed in the affidavit when he entered the trailer.

Detective Seals testified that the officers were not instructed to look for items relating to the manufacture of methamphetamine. Detective Seals testified that at the bottom of the hill where the Defendant was arrested, he was unable to see the trailer. Detective Seals testified that he did not see Patrolman Banks at the back door of the trailer when he entered. Detective Seals testified that it took him time to get back up the hill and enter the trailer. Detective Seals told the Court that it took him approximately five minutes from the time he saw the Defendant flee from the back door of the trailer until he walked up the hill and had sight of the trailer again.

Detective Seals testified that there was no methamphetamine lab in the woods behind the Defendant's residence. The Defendant testified that there was an active methamphetamine lab in an outbuilding behind the residence. The methamphetamine lab was discovered after search warrant was executed, and Detective Seals assumed the lab was active because he saw Detective Dalton taking samples for the lab to test.

### D. Testimony of Agent Stephen Kitts

Agent Stephen Kitts testified that he currently worked for the Grainger County

Sheriff's Department and was currently assigned to Fourth Judicial Drug Task Force. Agent Kitts testified that he has investigated over 100 methamphetamine labs and dump sites since 2006. Agent Kitts testified that the manufacture of methamphetamine has a particular odor, akin to ether, starter fluid, or an acetone smell. Agent Kitts testified that in his training and experience there are particular signs of a methamphetamine lab, such as gas generators, hosing, tubing, lithium batteries, lye, dry ice, and ammonium nitrate.

Agent Kitts testified that he took part in the investigation of the Defendant on July 27, 2010. Agent Kitts testified that Detective Dalton called him, told him that he had warrants for the arrest of the Defendant, and asked if he would accompany him to drive-by the Defendant's trailer. Agent Kitts testified that when the two drove by the Defendant's residence, there was a strong smell of ether coming from the road.

Agent Kitts testified that Detective Dalton informed him that Timothy Livesay was supposed to be on the Defendant's property, along with the possibility of a shotgun. Agent Kitts testified that he had previously dealt with both Mr. Livesay and the Defendant. Agent Kitts stated that he arrested the Defendant in 2003 on a methamphetamine related charge, in which he also fled the scene. Agents Kitts testified that he was aware of where Mr. Livesay resided in Bean Station, TN, and that this residence was approximately twenty to twenty-five minutes away from the Defendant's trailer.

Agents Kitts testified that on the night the officers were to execute the arrest warrant on the Defendant, he was stationed at the right side of the trailer. As soon as Agent Kitts made it to the back of the trailer, he stated that the Defendant was running down the back stairs and that he dropped some items from his hands. Agent Kitts asserted that he heard glass break. Agent Kitts said

that the Defendant continued toward the woods. Agent Kitts stated that he fell several times in his pursuit of the Defendant because the embankment was steep, over which the Defendant fled. Agent Kitts approximated that the embankment was sixty to sixty-five degrees straight down.

Agents Kitts stated that himself and Officer Sawyer chased the Defendant, and they all ended up at the bottom of the bank after falling. Agent Kitts testified that the Defendant was attempting to get up and run away at the bottom of the bank. Agent Kitts testified that he was taken to the hospital approximately thirty to thirty-five minutes later because of a bruised rib and a bruised thigh bone.

Agent Kitts testified after he placed the Defendant in custody, he walked back up the hill, directly to the location where the Defendant dropped items as he fled from officers. The items Agent Kitts identified that were dropped by the Defendant included: coffee filters, plastic baggies that had some white residue inside, and a glass dish that was broken. At this point, Agent Kitts testified that Patrolman Banks informed him that when he was clearing the outbuilding we observed plastic jugs which he believe to be generators. Agent Kitts was then shown a photograph of the backyard of the Defendant's residence. Agent Kitts testified that it was a fair and accurate depiction of the Defendant's backyard. Agent Kitts stated that the photograph was taken after the execution the search warrant, which was the reason the photograph depicted that it was daylight and the backdoor of the residence is shut. Agent Kitts identified where the Defendant tripped and dropped the items that he later found. This photograph was admitted at Exhibit F.

Agent Kitts testified that he followed up on the information provided by Patrolman Banks. Agent Kitts testified that he walked over to the outbuilding, looked inside the building, but did not enter. Agent Kitts testified that he saw the jugs, tubing, and tape around the tubing inside

the outbuilding identified by Patrolman Banks. Agent Kitts was shown a photograph and identified where he was standing when he looked inside the open outbuilding. Agent Kitts indicated where the jugs and tubing were located. This photograph was admitted as Exhibit G.

Agent Kitts stated that he informed Detective Dalton that he saw the gas jugs, tape, and tubing in the open outbuilding. Agent Kitts testified that there was another outbuilding on the property behind the trailer. Agent Kitts stated that its doors were open, and there were several cans of starter fluid inside. Agent Kitts further stated that there were lithium batteries found in the bed of one of the trucks, and a bag of dry ice on the back porch. Agent Kitts testified that he did not enter the outbuilding with closed doors.

Agent Kitts testified that he entered the back porch area. From this vantage point, Agent Kitts testified that he saw a stove and a small red light, which was similar to a headlamp. Agent Kitts was shown a photograph of the stove, red light, glass jars, and coffee filters. Agent Kitts testified that the photograph was taken during the initiation of the search warrant. Agent Kitts stated that he was not standing close enough to take such a photograph during the execution of the arrest warrant. Agent Kitts said that he was standing approximately eight to ten feet from the back door on the night of the execution of the arrest warrant, and that he had a clear line of sight into the trailer. Agent Kitts testified that he informed Detective Dalton of what he observed while standing on the back porch of the trailer. Agent Kitts testified that the photograph was a fair and accurate depiction of what he saw. The photograph was entered as Exhibit E.

On cross-examination, Agent Kitts testified that Exhibit E depicted the items he observed on the night of July 27, 2010. Agent Kitts testified that while the photograph was taken during the execution of the search warrant, he could see the light glowing, the glass jar, and the

coffee filters on the night of July 27, 2010.

Agent Kitts testified that at the bottom of the embankment, the Defendant attempted to get up. Agent Kitts stated that he told the Defendant "[d]on't move," however, the Defendant continued to try to move. After failing to comply with Agent Kitts directive, Agent Kitts testified that he Tased the Defendant.

Agent Kitts testified that he was at the bottom of the embankment with the Defendant for approximately five to seven minutes. Agent Kitts testified that Officer Masson cam down the embankment to help him and Officer Sawyer. Agent Kitts testified that he helped bring the Defendant halfway up the hill, Officer Masson took him the "other way and gave him to [Patrolman] Banks." [Tr. 99]. Agent Kitts testified that Officer Banks met the officers at the top of the embankment. Agent Kitts testified that he was he was not with the Defendant when the Defendant was taken to the front of the residence.

## III. ANALYSIS

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. The Defendant contends that his Fourth Amendment rights were violated by (1) the initial warrantless search of the trailer and outbuildings on, or about, July 26, 2010, (2) by the issuance of the search warrant for his trailer and outbuildings because the affidavit relied on and contained information illegally obtained from the warrantless searches of the trailer and outbuildings, and (3) the search warrant affidavit, which also contained information from an informant that was not proven reliable [Doc. 16].

Thus, the Defendant maintains that there was no probable cause to support the search

warrant and concludes that the Court must suppress all evidence flowing from the invalid search warrant. [Doc. 15].

The Government contends the warrantless searches of the Defendant's trailer and outbuildings were not unconstitutional because they were conducted under the "protective sweep" exception to the warrant requirement, the information in the search warrant affidavit that was obtained from the protective sweep was not unconstitutionally obtained and improperly included in the affidavit. Further, even without that information, the affidavit still provided probable cause for the search warrant to issue. [Doc. 19].

The Court will address each of the Defendant's arguments in turn.

## A. Warrantless Search of 502 Branch Road Lane

The Defendant identifies three police actions that violated his Fourth Amendment rights during the warrantless search/entry into his trailer and outbuildings: (1) entering the Defendant's trailer, (2) entry of the Defendant's shed, and (3) entry onto the Defendant's back porch.[1] The Government, as noted, contends that the warrantless searches of the Defendant's trailer and outbuildings were authorized under the protective sweep exception to the warrant requirement. [Doc. 19 at 6]. The Defendant argues that there was no legal right or basis for a protective sweep, and that the actions of the officers were not those of a protective sweep. [Doc. 24 at 2].

The Fourth Amendment protects an individual's right to be free from unreasonable searches and seizures. A judge may issue a search warrant for a home or personal property only

---

[1]The Defendant does not argue that it was improper for officers to observe methamphetamine-related items in the vehicles behind his trailer. Therefore, the Court's analysis is limited to the officers' entry into the Defendant's trailer and outbuildings.

upon a finding of "probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  In <u>United States v. United States District Court for the Eastern Dist. of Mich.</u>, the Supreme Court highlighted the rights recognized by the Fourth Amendment.  407 U.S. 297, 316 (1972).  The Court held

> [T]he very heart of the Fourth Amendment directive [is]: that, where practical a governmental search and seizure should represent both the efforts of the officer to gather evidence of wrongful acts and the judgment of the magistrate that the collected evidence is sufficient to justify invasion of a citizen's private premises or conversation.

<u>Id.</u>

There are exceptions to the warrant requirement, and the parties have identified that the protective sweep doctrine is at issue in the present case.  Officers may conduct a protective sweep to ensure the safety of the other officers during an arrest.  <u>Maryland v. Buie</u>, 494 U.S. 325, 327 (1990); <u>United States v. Biggs</u>, 70 F.3d 913, 915 (6th Cir. 1995).  In <u>Buie</u>, the Court found:

> [T]he Fourth Amendment would permit the protective sweep undertaken here if the searching officer possesse[d] a reasonable belief based on specific and articulable facts, which taken together with the rational inferences from those facts, reasonably warrant[ed] the officer in believing that the area swept harbored an individual posing a danger to the officer or others.

494 U.S. at 327 (internal quotations and citations omitted).

The Sixth Circuit Court of Appeals, citing <u>Buie</u>, has held that officers "must articulate facts that would warrant a reasonably prudent officer to believe that the area to be swept harbored an individual posing a danger to those on the scene." <u>Biggs</u>, 70 F.3d at 915.  In <u>Biggs</u>, the Sixth Circuit upheld a protective sweep by focusing on specific articulable facts that would warrant "a reasonably prudent officer to believe that the officers might be in danger" from another person on the scene.  <u>Id.</u>  The court noted the presence of three articulable facts that supported the officers

protective sweep: (1) the officers received information that the defendant planned to meet someone at his motel room, although they failed to see anyone leave or arrive from the motel room during the two-hour surveillance; (2) the defendant left the motel door open which left a clear view of the officers to anyone inside the room, threatening the safety of the officers; (3) and the officers were familiar with the defendant and knew he had been arrested on two prior occasions in the presence of someone in possession of a firearm.  Id. at 916.

Thus, in this case, the inquiry for this Court becomes whether the officers executing the arrest warrant against the Defendant had the requisite "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  Buie, 494 U.S. at 334.  The Court finds that facts, similar to those found in Biggs, existed in this case which supported the officers' belief that the Defendant and Mr. Livesay were on the Defendant's property, and that they posed a danger to other officers and the public.

Patrolman Burch informed Detective Dalton that he had stopped a vehicle in Grainger County for a traffic violation, several individuals fled the vehicle, and Patrolman Burch was alerted to the presence of a large amount of starter fluid in the car.  A woman remained inside the vehicle and explained they were delivering the starter fluid to the Defendant's property in Grainger County for the purpose of aiding the Defendant in cooking methamphetamine.  She also stated that a specific person, Timothy Livesay, might be at the property and that there might be a specific type of weapon present (shotgun), and that there was a sensor on the Defendant's driveway which alerted the Defendant to the presence of others on his property.  The credibility and corroboration of the woman's tip increased when officers detected the strong odor associated with the manufacture of

methamphetamine at or near the Defendant's residence.  See United States v. Elkins, 300 F.3d 638, 659-60 (6th Cir. 2002) (finding that the officers' detection of an odor of marijuana inside the house was "enough to establish probable cause for a warrant").  Additionally, the woman's credibility was further bolstered and her tip corroborated when the sensor on the driveway was observed, and an individual fled out the backdoor upon police arrival, suggesting criminal behavior.  See United States v. Colbert, 76 F.3d 773, 777 (6th Cir. 1996) (noting that "in some situations, an individual bursting out of a house unexpectedly may well give rise to a concern that a danger lurks inside the home.").

Notably, Detective Dalton testified that the Defendant had previously fled when police attempted to arrest him for manufacturing methamphetamine.  See Biggs, 70 F.3d at 916 (finding that articulable facts supported the officers protective sweep when they were familiar with the defendant and aware that he had been arrested previously in the presence of someone with a firearm).  Moreover, officers stationed toward the back of the trailer observed the Defendant drop materials, which consisted of a coffee filter containing a white powdery substance, a white prescription bag, and mason jars, all of which are used in the manufacture of methamphetamine.  Finally, the officers had received information from the Bean Station police that they had received information that Timothy Livesay was currently manufacturing methamphetamine, but a search of his residence showed neither he nor the manufacturing was present at that location.  These factors gave the white female's tip credibility and gave the officers an articulable reason to thus reasonably believe that the Defendant was not alone on the property and to reasonably believe that both Mr. Livesay and a shotgun could be located somewhere on the premises.

Moreover, once Detective Dalton and Deputy Cook knocked on the front door of the Defendant's trailer, a person, later identified as the Defendant, fled out the back door of the trailer.

24

Further, the Defendant left the backdoor open after he fled, creating a tactical disadvantage for the officers. See Biggs, 70 F.3d at 916 (finding that "defendant left the motel room door open so that anyone present in the room had a clear view of the officer, thereby threatening their safety from an unknown person present in the room.") Therefore, the officers on the scene were left without knowledge of the identity of the fleeing individual from the trailer, coupled with the tactical disadvantage of the Defendant leaving the backdoor to the trailer open as he fled. Without identification of the fleeing individual, an open backdoor, the very late hour of the night, the darkness inside and outside of the trailer, the presence of various outbuildings, and information that Mr. Livesay and a shotgun might be present on the property, it was reasonable for officers left on the scene to believe that others were on the Defendant's property, whom they could not see, but who could pose a danger to the officers' safety.

The Defendant asserts that there was no evidence that he nor Mr. Livesay was a dangerous individual. However, the past dangerousness of the individual is not the sole issue, rather it is facts "giving rise to a suspicion of danger from attack by a third party during the arrest." Colbert 76 F.3d at 777. In this situation, officers had information that the Defendant and Mr. Livesay were on the Defendant's property with a weapon and that they were engaged in manufacturing methamphetamine. Further, the Bean Station Police Station Department informed Detective Dalton that Mr. Livesay was not at his home, making it a stronger possibility that Mr. Livesay was with the Defendant on the Defendant's property with a weapon and that they were engaged in manufacturing methamphetamine. In this case, the issue is not whether the Defendant and Mr. Livesay had a history of dangerousness, but rather, if the situation known to law enforcement gave rise to a suspicion that they were in danger from an attack.

Thus, the Court finds that reasonable articulable facts existed to allow officers to perform a protective sweep within the limitations addressed above. The Court will now turn to whether the officers' actions in entering the Defendant's trailer, outbuildings, and back porch were lawful protective sweeps based on the above articulable facts.

### (i) Entry of the Trailer by Detective Seals

In this case, the Defendant argues that "the officer" (i.e., Detective Seals) did not perform a legal protective sweep when he entered the backdoor of the Defendant's trailer and went straight thru to the front door. [Doc. 24 at 3]. The Government responds that Detective Seals was searching for people, not evidence, and that the protective sweep was valid. [Doc. 25 at 2]. Additionally, the Government asserts that Detective Seals failed to uncover evidence as a result of his protective sweep, therefore, there is no evidence to suppress. [Doc. 25 at 2].

In this case, the Defendant left the back porch door open as he fled. Detective Seals testified that he chased the Defendant as he fled. Detective Seals stopped chasing the Defendant approximately fifty feet from the spot where he was brought into custody. Once Detective Seals was aware that the Defendant was in custody, he came up the hill to inform Detective Dalton and Deputy Cook of the arrest. Detective Seals was unable to immediately contact or locate Detective Dalton or Deputy Cook and out of concern/fear for officer safety he proceeded into and through the trailer.

In this case, Detective Seals acted properly to secure the trailer for the purpose of ensuring the safety of other officers on the scene. Detective Seals was operating under a reasonable belief based on reasonable articulable facts that another person and a weapon was on the property, which supported his belief that such other person on the premises would pose a danger to police

26

safety.  Further, the Defendant's action of fleeing indicated that he might have something to hide.

See United States v. Taylor, 248 F.3d 506, 14 (6th Cir. 2001) (noting a "demeanor [that] indicated that [defendant's brother] was trying to hide something" when upholding a protective sweep). Detective Seals testified that he entered the backdoor of the trailer, based on his fear for the other officers' safety.  Once Detective Seals failed to observe anyone inside the trailer, he exited through the front door.  Detective Seals testified that he did not see any incriminating evidence inside the trailer.  Therefore, Detective Seals entered the trailer for the limited purpose of securing the premises in order to ensure the safety of other officers on the scene.

The Defendant makes the blanket contention that such a sweep, without checking other rooms, does not constitute a protective sweep.  However, he offers neither factual, legal, or testimonial support for such a claim.  Furthermore, there was no proof that Detective Seals couldn't/didn't see all that he needed to see for the limited purpose of officer safety during his brief entry into and through the Defendant's trailer.  Even if Detective Seals's protective sweep was deficient, such deficiency neither enures to the Defendant's benefit nor negates the validity of the entry and protective sweep.  Finally, even if he failed to check all the rooms, this Court agrees with the Government's contention that Detective Seals's sweep is not unlawful simply because it is "more limited than what the law would have permitted."  [Doc. 25 at 3].

Accordingly, the Court finds that Detective Seals' protective sweep of the Defendant's trailer was proper.  Additionally, since Detective Seals failed to see any incriminating evidence inside the trailer, the Court finds there is no evidence suppressible based on his entry of the trailer.

### (ii) Outbuilding Sweep by Patrolman Banks

The Defendant argues that the initial search of the his outbuildings was without a search warrant and, thus, violated the Fourth Amendment. [Doc. 16 at 2]. The Defendant contends that the officers were allowed to approach the home and arrest the Defendant pursuant to the arrest warrant, however, the officers had no authority to enter the outbuilding or the home. [Doc. 16 at 2]. Additionally, the Defendant asserts that there were no articulable facts to perform a protective sweep of the outbuildings, and the officers were merely using the arrest warrant as a basis for searching the property. [Doc. 24 at 5]. The Government responds that Patrolman Banks's protective sweep of two outbuildings on the Defendant's property was lawful for the same reasons as stated for the protective sweep of the trailer. [Doc. 19 at 10].

Patrolman Banks was stationed on the left-side of the trailer on the night the arrest warrant for the Defendant's arrest was executed. Patrolman Banks testified that he was uncertain of the identity of the individual who fled the trailer, but he was aware another person was potentially on the property. Patrolman Banks testified that he entered two outbuildings on the Defendant's property for the purpose of securing the area by "clearing" these buildings and to make sure no one else was in there. He testified he was looking for humans. The first outbuilding Patrolman Banks approached had a closed door. No incriminating evidence was found in the first outbuilding. The door to the second outbuilding was open, however, when Patrolman Banks "entered" it. Patrolman Banks testified that he took only one step into the outbuilding, and remained in the building for only one second. While inside the second outbuilding, Patrolman Banks testified that he noticed jugs with a hose running out of them. Patrolman Banks reported this information to Agent Kitts. Agent Kitts testified that Patrolman Banks reported that he noticed jugs with hose running out them, which

Patrolman Banks believed to be generators.[2]

At the point when Patrolman Banks entered the outbuildings, he was aware of articulable facts that made it reasonable for him to believe that officers might be in danger from someone else on the Defendant's property. First, Patrolman Banks had information from the informant's tip that the Defendant and perhaps a Mr. Livesay and a shotgun were on the Defendant's property participating in manufacturing methamphetamine and that the smell associated with manufacturing methamphetamine was present at this location. Second, Patrolman Banks was aware that an individual fled the Defendant's trailer, but was uncertain of the individual's identity. See Colbert 76 F.3d at 777, (noting that "in some situations, an individual bursting out of a house unexpectedly may well give rise to a concern that a danger lurks inside the home."). Further, it was reasonable to believe that whether it was Mr. Livesay who exited the back of the trailer or the Defendant, (based on the information received that Mr. Livesay was not at his residence in Bean Station) that both the Defendant and Mr. Livesay were on the Defendant's property and, thus, one person was unaccounted for and remained a threat.[3] Additionally, Patrolman Banks's sweep of the outbuildings was for the limited purpose of searching for humans and securing the premises to ensure the officers' safety after the Defendant fled the trailer. See Taylor, 248 F.3d at 513-514

---

[2] Agent Kitts testified that he followed-up on what Patrolman Banks reported. Officer Kitts stated that he walked over to the shed, did not enter, but was able to see "the jugs with the tubing coming out with tape around the tubing." [Tr. 90]. Detective Dalton testified that Agent Kitts reported the information obtained by the other officers on the night in question.

[3] A tip was received by the Bean Station Police Department that Mr. Livesay was manufacturing methamphetamine at his home in Bean Station, TN. This tip was from a man who originally fled from Patrolman Burch's traffic stop, and was in the same vehicle as the female who informed Patrolman Burch that the Defendant and perhaps Mr. Livesay were manufacturing methamphetamine on the Defendant's property.

(holding that a protective sweep not made pursuant to a lawful arrest was proper when officers needed to secure the premises because the purpose of such a sweep is to "protect the safety of the officer[s] who remains on the scene").

Accordingly, this Court finds that based on the combination of circumstances, the sweep of the outbuildings entered by Patrolman Banks was reasonably directed to uncover any threats to officer safety and, thus, valid.[4]

### (iii) Agent Kitts's Entry Onto Back Porch and Observation of Five Cans of Starter Fluid

The Defendant argues that Agent Kitts had no right to be on the back porch of the his trailer when he observed certain items, such as a lit stove top and coffee filters. [Doc. 24 at 6]. Additionally, the Defendant argues that the five cans of starter fluid were observed in an outbuilding behind the trailer without a search warrant and, thus, this information was improperly included in the search warrant affidavit. [Doc. 16 at 1-2]. The Government responds that Agent Kitts was conducting a proper protective sweep and that Agent Kitts had a straight view of the stove. [Doc. 25 at 3]. The Government does not address the five cans of fluid discovered by Agent Kitts.

The search conducted by Agent Kitts necessitates a discussion of the underlying differences between the purpose of an arrest warrant versus that of a search warrant. In <u>Steagald v.</u>

_____

[4]The Defendant argues that officers were limited to a brief sweep in the immediate vicinity of his arrest. The Defendant asserts that he was arrested 500 feet away from the trailer, and this fact ruins the officers' ability to perform a protective sweep. The Court notes that Patrolman Banks was unaware that the Defendant was the individual who fled the trailer, and had information to believe that two people were on the property, manufacturing methamphetamine, with a firearm. Moreover, Patrolman Banks only stepped into the open second outbuilding, one step, and for one second. Such an act cannot be characterized, as the Defendant urges, as a "ruse to do a search." [Doc. 24 at 5].

United States, the Supreme Court found that "[t]he purpose of a warrant is to allow a neutral judicial officer to assess whether the police have probable cause to make an arrest or conduct a search." 451 U.S. 204, 212 (1981). The Court identified the fundamental differences between the purpose of an arrest warrant and of a search warrant by stating:

> [a]n arrest warrant . . . serves to protect an individual from an unreasonable seizure. A search warrant, in contrast . . .safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.

Id. at 212-13. Further, the Court found that the main issue was "whether [an] arrest warrant . . . adequately safeguard[s] the interests protected by the Fourth Amendment depends upon what the warrant authorize[s] the agents to do." Id. at 213.

In this case, Agent Kitts walked back up the hill behind the Defendant's trailer after he placed the Defendant in custody.[5] Agent Kitts entered the back porch, shined a flashlight inside the open backdoor of the trailer, and observed methamphetamine related items. Agent Kitts also looked inside the an open outbuilding behind the Defendant's trailer were he saw five cans of starter fluid. Agent Kitts was armed with an arrest warrant, not a search warrant. By the time Agent Kitts entered the back porch of the trailer and shined his flashlight in the open door of the trailer, the arrest of the Defendant was already effectuated. Additionally, the Defendant's was already under arrest when Agent Kitts observed five cans of starter fluid in an open outbuilding behind the trailer. Once Agent Kitts identified the items dropped by the Defendant as he fled the backdoor of the trailer,

_____

[5]Agent Kitts testified that he walked "straight to where [the Defendant] dropped the items . . . some coffee filters, plastic baggies [that] had some white residue in it, and the glass dish that was broken." [Tr. 88]. The inspection of items dropped by the Defendant during a police pursuit was proper by Agent Kitts. See California v. Hodari D., 499 U.S. 621, 629 (1991) (holding that "cocaine abandoned while [defendant] was running was in this case not the fruit of a seizure, and his motion to exclude evidence of it was properly denied").

Agent Kitts could not remain on the property because the purpose behind his presence on the Defendant's property was complete. See United States v. Damrah, 322 F. Supp. 2d 892, 898 (N.D. Ohio 2004) (concluding that "once the agents effectuated the arrest and removed Fawaz Damrah from his home, their job was finished . . . agents had no right to enter or to remain on the property").

Moreover, the protective sweep doctrine does not encompass the actions taken by Agent Kitts. In Buie, the Court held that a protective sweep must "last[ ] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premise." Buie, 494 U.S. at 335-36. Therefore, the protective sweep doctrine "limits both the purpose of such lingering (to ensure the officers' safety) and the permissible time of such lingering (no longer than it takes to complete the arrest and depart the premises)." Damrah, 332 F. Supp. 2d at 898 (internal quotations omitted).

In this case, Agent Kitts was lingering in the area behind the trailer, five hundred feet from the arrest site, following the execution of the arrest warrant. Agent Kitts was on the property longer than necessary to complete the arrest of the Defendant and depart the premises. Further, Agent Kitts did not testify to circumstances or articulate facts that caused or reasonably would have caused him to fear for the the other officers' safety *after* the Defendant was arrested and *after* the protective sweeps by Officers Seals and Banks were completed, and which would have necessitated his entrance onto the back porch and peering inside the trailer for the ostensible purpose of securing the area.

Accordingly, this Court finds that evidence regarding Officer Kitt's observations of a lit stove, with coffee filters, and glass container(s), observed inside the trailer and five cans of starter fluid in an outbuilding should be suppressed and for purposes of the following analysis,

stricken from Detective Dalton's affidavit for a search warrant of the Defendant's trailer and outbuildings. The Court will also consider the Government's argument concerning the applicability of the inevitable discovery doctrine as applied to this finding below.

### (B) Probable Cause to Support the Search Warrant of 502 Branch Road

The Defendant argues that there was not probable cause to support a search warrant for 502 Branch Road in this case. [Doc. 16 at 4]. Specifically, the Defendant cites two problems with the search warrant: (1)the affidavit contains hearsay statements relayed by a white female, with nothing in the affidavit to support her reliability and (2) the affidavit which supports the search warrant contains illegally obtained information. [Doc. 16 at 4]. The Government responds that the that even if the Court determines some information must be excluded from the affidavit, the affidavit still contains more than enough facts to establish probable cause that the Defendant was producing methamphetamine on his property. [Doc. 19 at 10]. In addition, the Government contends that there was sufficient evidence to corroborate the white female's tip. [Doc. 19 at 12].

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. In this respect, a judge shall not issue a warrant for the search of a home or personal property except upon a finding of "probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

Probable cause to search is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). To make such a showing "requires only a probability or substantial chance of criminal activity, not an actual

showing of such activity." Id. at 244 n.13.  Thus, the Supreme Court has observed that

> probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," Carroll v. United States, 267 U.S. 132, 162, 45 S. Ct. 280, 288, 69 L. Ed. 543 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.    A "practical, nontechnical" probability that incriminating evidence is involved is all that is required.   Brinegar v. United States, 338 U.S. 160, 176, 69 S. Ct. 1302, 1311, 93 L. Ed. 1879 (1949).

Texas v. Brown, 460 U.S. 730, 742 (1983).  In other words, probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990).  Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances.  Gates, 462 U.S. at 238.

Initially, the Court would note that the issuing judge's determination that probable cause exists is entitled to "'great deference.'"   United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (quoting Gates, 462 U.S. at 236).  This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches.  Id.  In determining the sufficiency of the search warrant affidavit, the Court is "concerned only with the statements of fact contained in the affidavit."  United States v. Hatcher, 473 F.2d 321, 323 (6th Cir. 1973); see also Whiteley v. Warden, 401 U.S. 560, 565 (1971).  In reviewing the propriety of the search warrant, the Court considers "the evidence that the issuing magistrate had before him only 'to ensure that [he] ha[d] a substantial basis . . . for concluding that probable cause existed.'"  United States v. Jones, 159 F.3d

969, 973 (6th Cir. 1998) (quoting <u>Gates</u>, 462 U.S. at 238-39) (alterations in original).  In addition, "a warrant application must provide sufficient information to allow an issuing judge to independently determine probable cause; his action cannot be a mere ratification of the conclusions of others." <u>United States v. Gunter</u>, No. 07-5277, 2009 WL 37481, at *6 (6th Cir. Jan. 8, 2009) (citing <u>Gates</u>, 462 U.S. at 239).

In the present case, the relevant portions of the affidavit state as follows:

1. I am a Detective Lieutenant assigned to conduct criminal investigations for the Grainger County Sheriff, having been so employed for the past seven years.  I have been a law enforcement officer since 2002.  My experience includes a total of five years of investigative work and approximately two years of general law enforcement experience I have been involved in numerous criminal investigations.  I have conducted several investigations into the manufacture of Methamphetamine.  I attended a basic 40 hours training course through the Tennessee Methamphetamine Task Force in 2005.  Thus learning what chemicals are involved in the manufacture of Methamphetamine.  I also attended a 40 hour Advanced Methamphetamine Course in 2008.  I am certified as an officer capable to identity components commonly used to manufacture the drug Methamphetamine.  I have disassembled several Methamphetamine labs from 2005 until now.  I have spoken to and trained other officers, as well as, the general public as to the dangers and components present at methamphetamine labs.  I have numerous hours of other training involving law enforcement procedures and techniques.

2.  Based on my experience, training, and my investigation beginning 07-26-2010, and with cooperation between me, members of the Grainger County Sheriff's Office, Jefferson City Police Department, has revealed the following evidence constituting the grounds for this search warrant:

a.  A phone call was received to myself from Patrolman Dusty Burch with Jefferson City Police Department on this date regarding the possible location of a Methamphetamine lab.  Patrolman Burch had spoken with a white female whom had in her possession an excess amount of Starting Fluid.  Burch further alleged that according

to female Charles Carpenter was present at home in Grainger County and was in the process of Manufacturing Methamphetamine. White female alleges persons with her whom fled on foot were in the process of taking Starting Fluid to Carpenter.

b. A check for warrants on Carpenter through Jefferson County showed three outstanding warrants. Warrant # 07-5356 shows to be a Capias/Bench Warrant issued out of Jefferson County Session Court on May 09, 2007. Warrant #07-05020 was issued by Criminal Court Judge O. Dewayne Slone on April 09, 2007 for Violation of Probation. Warrant #09-2176 was issued by Criminal Court Judge Dewayne Slone on December 10, 2009 for Violation of Probation. All three Warrants are listed with No Bond.

c. Officers went to the address of 502 Branch Road Blaine, TN 37709 in an attempt to locate Carpenter for Warrant service. While at Branch Rd a Chemical odor consistent with that of Manufacturing Methamphetamine was noticed. Upon exiting of vehicles officers went to both front and rear doors of home. Officer near rear door observed a white male running out the back door and into the wood line. Subject had items curled in arms (coffee filter with white powdery substance, a white prescription bag, and mason jars). Subject dropped items and fled into wood line. Subject was apprehended after a short foot pursuit. Subject was identified as Charles Lynn Carpenter.

d. Other officers searched at the same time a garage that had an open door for other subjects and officer safety. Two gas Generators, a container containing off white slug material, and rubber tubing was located lying in floor in plain view.

e. The dwelling Carpenter fled from was also searched for other subjects and for officer safety. Officers went onto porch of opened back door and saw in plain view on porch a bag of dry ice (opened). Once inside of the dwelling on the cooking stove was a burning flash light next to coffee filters, and glass containers.

f. In an opened building behind home approximately 5 cans of Starting Fluid were located on the ground.

g. A check of vehicles sitting in back of dwelling revealed a white female (Marlena Kysor) asleep in a 1988 Mercedes Tag #967-TFM. Kysor was awaked and detained for her safety. Another

vehicle a Blue Chevrolet Pickup was checked for subjects and officers discovered a can of Heet (Gas Line Antifreeze) in bed of Pickup. A Red Ford Ranger Tag # 157-WXQ was also checked and revealed empty Dry Ice bags, Aluminum Foil, and Drain Cleaner in bed of pickup. Officers looked through window of vehicle and observed Lithium Strips lying in the seat.

[Exh. H].

The Court will now turn to the questions of whether there is sufficient evidence to corroborate the "white female" named in the affidavit and whether the affidavit was supported by probable cause based on the Court's previous finding above, that evidence regarding Agent Kitts's "search" should be suppressed and stricken from this affidavit.

### (i) Reliability of "White Female" Named in the Affidavit

The Defendant argues that the affidavit is based on hearsay statements from a "white female," whose reliability is not established in the affidavit. [Doc. 16 at 4]. The Government contends that there was sufficient corroborating evidence to establish the reliability of the "white female." [Doc. 19 at 12].

It is well established that a magistrate may rely on hearsay evidence when making a probable cause determination. United States v. Helton, 314 F.3d 812, 819 (6th Cir. 2003). When hearsay evidence is presented based on a confidential informant or anonymous tipster, a court should consider three factors in giving the information its due weight within the totality of the circumstances inquiry: (1) the veracity of the tipster; (2) the reliability of the tip and tipster; and (3) the tipster's basis of knowledge. See Helton, 314 F.3d at 819. These factors are not intended to be applied as a rigid test, but "should be considered in weighing all the circumstances." United States v. Noda, 137 F. App'x 856, 863 (6th Cir. 2005) (internal citations omitted). "Although these three factors are

applied to anonymous and confidential tips, the court's main inquiry in examining probable cause centers on the totality of the circumstances." Id. (citing Illinois v. Gates, 462 U.S. 213, 232 (1983)). Moreover, "[i]t is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduce[] the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" Gates, 462 U.S. at 244-245 (quoting Jones v. United States, 362 U.S. 257, 269 (1960)).

While an affidavit in support of a search warrant must state facts supporting an independent judicial determination that the informant is reliable, those facts need not take any particular form. United States v. Allen, 211 F.3d 970, 975-76 (6th Cir. 2000). The affidavit could state that police corroborated significant parts of the informant's story, "or there could be other indicia of the informant's reliability, such as a detailed description of what the informant observed first-hand, or the willingness of the informant to reveal his or her name. Information need not be legally competent evidence in a criminal trial to be considered in the probable cause determination for a search warrant. Draper v. United States, 358 U.S. 307, 311 (1959). "As long as the issuing judge *can conclude independently* that the informant is reliable, an affidavit based on the informant's tip will support a finding of probable cause." United States v. Jackson, 470 F.3d 299, 307 (6th Cir. 2006) (citing Allen, 211 F.3d at 976) (emphasis added). Information from an informant may be corroborated by innocent facts provided by the informant. United States v. Jones, 159 F.3d 969, 974 (6th Cir. 1998). It is not necessary that the police corroborate the criminal conduct itself. Gates, 462 U.S. at 243-44; Alabama v. White, 496 U.S. 325, 331 (1990). Uncertainty regarding the informant's veracity can be compensated for by a strong showing of his basis of knowledge or information that provides detail that can be corroborated. United States v. King, 227 F.3d 732, 743 (6th Cir. 2000)

In this case, the Defendant is correct that Detective Dalton did not personally attest to the reliability of the "white female." The affidavit states that the white female informed Patrolman Burch that "persons with her whom fled the vehicle . . . were in the process of taking Starting Fluid to [Charles] Carpenter." [Exh. H at ¶ 2a]. The affidavit also identified that the white female reported that the Defendant was at home, in Grainger County. [Exh. H at ¶ 2a]. Further, the white female identifies that the Defendant was "in the process of Manufacturing Methamphetamine." [Exh. H at ¶ 2a].

In this case, the veracity and reliability of the source may be inferred based on the stated corroborating evidence uncovered by officers prior to executing and during the execution of arrest warrant. First, the affidavit establishes that prior to executing the arrest warrant, officers smelled methamphetamine at the Defendant's residence, corroborating the white female's statement that the Defendant was manufacturing methamphetamine at his home. [Exh. H at ¶ 2a]. In addition, the affidavit notes that while fleeing the trailer, the Defendant dropped a coffee filter with a white powdery substance, a white prescription bag, and mason jars. [Exh. H at ¶ 2c]. This information was learned during the arrest and further corroborates the white female's tip that the Defendant was manufacturing methamphetamine at his home. Moreover, the affidavit states that the Defendant fled out the backdoor of his home, corroborating the female's statement that the Defendant was at his home in Grainger County. These three facts were not merely corroboration of innocent facts provided by the white female, but included corroboration of criminal conduct as well. Therefore, there was sufficient corroborating evidence, identified in the affidavit, to corroborate the veracity and

reliability of the white female.[6]

Moreover, even if the information provided by the white female was removed, the affidavit is still supported by probable cause. First, the affidavit states that officers detected an odor of the manufacture of methamphetamine when they arrived at the Defendant's residence to execute arrest warrants. [Exh. H at ¶ 2c]; see Elkins (finding that "[a] sufficiently corroborated tip of drug activity can support a warrant to search a home" and suggesting that officers detection of odor of marijuana inside a house could be enough to establish probable cause). Second, the affidavit identifies that the Defendant fled out the backdoor of his trailer after officers knocked on his front door, suggesting his involvement in criminal activity. [Exh. H at ¶ 2c]. Third, the affidavit acknowledges that officers observed the Defendant flee from the back porch of the trailer, and drop methamphetamine manufacturing-related items, including a coffee filter, white powdery substance, prescription bag, and glass jars. [Exh. H at ¶ 2c]; see United States v. Caldwell, No. 99-6031, 2000 WL 1888682, *5 (6th Cir. Dec. 19, 2000) (finding there "is no dispute that the contents of the bag," which officers recovered outside of the residence, "provided probable cause to support the warrant to search Wilson's residence for evidence of methamphetamine production").

Therefore, the affidavit in this case was not based solely on an anonymous tip, but also included substantial police corroboration that the Defendant was manufacturing methamphetamine at his residence in Grainger County. Additionally, the Court finds that even if

---

[6]Per the testimony at the evidentiary hearing, there was other substantiating corroboration - e.g., police officers knew that the person the female identified (i.e., the Defendant) had a previous criminal history involving the manufacturing of methamphetamine and police officers also observed the "dinger" on the driveway that the female said would be there. However, as these facts were not in Detective Dalton's affidavit, they were not considered by Judge Slone and hence cannot be considered by this Court.

the reference to the information provided by the white female was removed from the affidavit, the affidavit is still supported by probable cause.

**(ii)  Probable Cause Supports the Affidavit After Redacting Information From Agent Kitts's Protective Sweep**

This Court found that Agent Kitts conducted an illegal "search" when he went onto the Defendant's back porch for the purpose of looking into the Defendant's residence and then went and looked in the Defendant's outbuilding for the apparent purpose of "searching" for evidence.  The Court will now determine whether the search warrant affidavit's content is sufficient to support a finding of probable cause after the redaction of the information relating to Agent Kitts's observations.

After redacting information from a search warrant affidavit that was obtained as the result of an illegal search, a court must determine whether probable cause exists based on the remaining content of the affidavit.  See United States v. Shamaeizadeh, 80 F.3d 1131, 1135-36 (6th Cir. 1996).  Removing the information from Agent Kitts's "search," specifically paragraphs 2e and 2f of the affidavit, the redacted affidavit provides substantial factual information.  The face of the affidavit establishes that the Defendant fled from his trailer, dropping coffee filters, a white powdery substance, a white prescription bag, and mason jars.  [Exh. H at ¶ 2c].  Paragraph 2d identifies two gas generators, a container of off-white slug material, and rubber tubing, that were found in a garage with an open door, while a search was performed for other subjects and officer safety.[7]  In addition,

_____

[7]The Court believes that Paragraph 2d of Detective Dalton's sworn affidavit more specifically references what Patrolman Banks testified that he observed: "jugs with a hose running out of them." [Tr. 54].

Paragraph 2g references dry ice bags, aluminum foil, drain cleaner, and lithium strips observed by officers in vehicles behind the trailer. [Exh. H at ¶ 2g]. Further, Paragraph 2c indicates that officers detected a chemical odor consistent with the manufacture of methamphetamine when they executed the arrest warrants at 502 Branch Road. [Exh. H at ¶ 2c].

The Court finds that for these reasons, and the reasons set forth in (B)(i) *supra*, that the redacted affidavit still establishes probable cause for the search of 502 Branch Road. Based on the factual information provided even in a "redacted" affidavit, it still raised "a fair probability that contraband or evidence of a crime," particularly the illegal manufacture of methamphetamine, would be found at the Defendant's residence. United States v. Graham, 275 F.3d 490, 501-02 ( 6th Cir. 2001) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

Based on the totality of the circumstances, as found within the information contained in the affidavit, as noted herein, this Court finds that a neutral and detached judge "may believe that evidence of a crime will be found" in these locations (quoting Allen, 211 F.3d at 976) and that the information provided *does* establish a fair probability that contraband or evidence of a crime will be found at these locations.

As such, and giving the conclusions drawn by the issuing judge the appropriate deference, this Court finds and holds that there was a substantial basis for concluding that probable cause existed for the issuance of this search warrant.

### (a)    Inevitable Discovery Doctrine

The Government argues that even if information obtained from the protective sweeps was unlawful, evidence of methamphetamine production would have been inevitably discovered at

502 Branch Road pursuant to the valid search warrant. The inevitable discovery rule excepts from exclusion those items that were unlawfully obtained if they would have been inevitably discovered. See Nix v. Williams, 467 U.S. 431, 448 (1984). The rule applies only "when the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." United States v. Kennedy, 61 F.3d 494, 499 (6th Cir.1995). Therefore, the inevitable discovery doctrine "allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." United States v. Taylor, 248 F.3d 506, 514 (6th Cir. 2001) (internal citations and quotations omitted).

The Sixth Circuit Court of Appeals has applied the inevitable discovery doctrine in cases where an "illegal search was followed by a search conducted in accordance with a valid search warrant premised on evidence of probable cause developed independently of the initial search." United States v. Bowden, 240 F. App'x 56, 61 ( 6th Cir. 2007). In the present case, the Court found above that the search warrant affidavit was supported by probable cause, even with the information garnered from the illegal sweep redacted. While this Court found that the "search" performed by Agent Kitts was unlawful, the evidence he observed was subsequently discovered on July 27, 2010, pursuant to a valid search warrant. Specifically, officers executing the search warrant found glass jars and a package of coffee filters in the Defendant's kitchen, which was the same evidence observed by Agent Kitts when he looked in the home a few hours earlier. In addition, officers executing the search warrant found five cans of starter fluid, which was also observed by Agent Kitts a few hours earlier.

Accordingly, this Court finds that the search warrant provided a valid basis for the inevitable discovery of the coffee filters and glass jars located in the kitchen and the five cans of starter fluid found in the open outbuilding, which were originally unlawfully observed by Agent Kitts.


## IV.    CONCLUSION

For the reasons set forth herein, it is hereby **RECOMMENDED** that the Defendant's Motion to Suppress Evidence **[Doc. 15]** be **DENIED**.[8]

Respectfully Submitted,


    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[8] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).